**In re Monte Ross WALDRON and Masako Waldron, Debtors.**

**Bankruptcy No. 285–20425.**

United States Bankruptcy Court, N.D. Texas, Amarillo Division.

Sept. 17, 1986.*

Thomas P. Stamps, Atlanta, Ga., Dan C. Coffey, Dalhart, Tex., for debtors.

Coleman Young, Culton, Morgan, Britain & White, Amarillo, Tex., for Serendipity.

## MEMORANDUM OF DECISION

### CONCERNING LAND SALE CONTRACT

JOHN C. AKARD, Bankruptcy Judge.

*Statement of Facts*

On February 26, 1982, Serendipity Farms (Serendipity) and the Debtors entered into

a "Real Estate Multi-Party Exchange, Purchase and Sale Agreement" (Agreement) along with a third party, Chris Bauer. The Agreement covered 464 acres of farm land in Hartley County, Texas, together with a residence, tenant house, barn, other buildings, and irrigation equipment located on the property. The Agreement provided for the escrow of a Warranty Deed from Serendipity to the Debtors. The escrow agent is to deliver the deed to the Debtors upon completion of their payments on a Note in the principal sum of $375,900.00. The Note is payable in ten annual installments with the first installment due on December 20, 1982. On March 6, 1980, Serendipity contracted to purchase this same property from Kermit D. Casper and his wife, Alvina K. Casper by execution of similar documents.

The Debtors took possession of the property upon the execution of the Agreement. They made three annual payments of $48,-757.98 in 1982, 1983, and 1984. On December 12, 1985, the Debtors filed a Petition for Relief under Chapter 11 of the Bankruptcy Code and no *annual* installment payments have been made to Serendipity since that date.

Serendipity filed a Motion to Compel the Debtors to accept or reject the Agreement as an executory contract. Under an Interim Order issued by the Honorable Harold Abramson, Debtors are making adequate protection payments to Serendipity in the amount of $2,550.00 per month. Judge Abramson's Order specifically reserved to this Court the question addressed in this Opinion.

### Question Presented

The question before the Court is whether a land sale contract entered into by the Debtors is an executory contract under 11 U.S.C. § 365, or whether it is a mortgage. Such contracts are also referred to as contracts for deed and as contracts of sale. Land sale contracts generally provide that upon making a down payment, the vendee is entitled to immediate possession of the property. Record title to the property remains in the vendor until the purchase price is paid in full. Payments are often made in installments extending over a number of years. The vendor may place a deed in escrow to be delivered to the vendee when the purchase price is paid in full. If the vendee defaults in making his payments, the vendee forfeits his rights in the property and becomes a tenant subject to eviction under applicable landlord/tenant laws. The vendor is not required to conduct any court or public proceedings to terminate the contract or "foreclose" the vendee's interest in the property.

This distinction has a major effect on the Debtors' reorganization plans and, perhaps, on the Debtors ability to reorganize at all. If the land sale contract is an executory contract, it may be assumed or rejected. If it is assumed, the Debtors must take the contract as written, with its benefits and burdens. If the contract is assumed, defaults must be cured, damages (if any) must be paid, and adequate assurance of performance must be given. 11 U.S.C. § 365.

If the land sale contract is a mortgage, assumption is irrelevant and no administrative costs are incurred. The mortgage may be "dealt with" in the plan in any number of ways, including scaling down the debt, reducing the interest rate, and extending the maturity.

### Which Law to Apply

The relationship between state property laws and the equity powers of the Bankruptcy Court was determined by the United States Supreme Court in *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). The *Butner* Court found that, in most instances, Bankruptcy Courts should follow state property laws, regardless of counterveiling claims of "equity." The Court stated:

> ... Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.... Property interests are created and defined by state law. Unless some federal interest requires a different re-

sult, there is no reason why such interest should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy." *Id.* at 54–55, 99 S.Ct. at 917–18. The Supreme Court in *Butner* stressed the importance of state law to the decisions of Bankruptcy Courts. The *Butner* decision also clarified the Court's position on the proper place for the equity powers of Bankruptcy Courts stating:

> The equity powers of the bankruptcy court play an important part in the administration of bankrupt estates in countless situations in which the judge is required to deal with particular, individualized problems. But undefined considerations of equity provide no basis for adoption of a uniform federal rule affording ... (a party) ... an automatic ... property interest ... as soon as the ... (debtor) ... is declared bankrupt....

*Id.* at 55–56, 99 S.Ct. at 918. The *Butner* Court set down the rule which Bankruptcy Courts should apply when the Bankruptcy Code itself does not specifically address an issue:

> ... [t]he federal bankruptcy court should take whatever steps are necessary to insure that the ... (creditor) ... is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued.

*Id.* at 56, 99 S.Ct. at 918.

*Butner* was decided under the Bankruptcy Act of 1898 but it "is still good law under the Bankruptcy Code of 1978." *Wolters Village, Ltd. v. Village Properties, Ltd. (In re Village Properties, Ltd.)* 723 F.2d 441, 443 (5th Cir.1984).

Therefore if, in evaluating the express wording of 11 U.S.C. § 365, this Bankruptcy Court believes that the Code does not expressly deal with the question of land sale contracts when the Debtor is the vendee then, under the *Butner* decision, this Court should look to the laws of the State of Texas to determine the treatment of such contracts.

### Federal Law

The thorough and oft-cited opinion of the Honorable Ralph R. Mabey, *In re Booth*, 19 B.R. 53 (Bankr. Utah 1982), argues strongly that a land sale contract in which the vendee is the Debtor should *not* be considered an executory contract under 11 U.S.C. § 365. Judge Mabey sets forth three cogent reasons for his conclusion:

1. *Enlarging the Value of the Estate.* Judge Mabey asserts that the assumption or rejection of executory contracts, like the strong-arm and other avoiding powers, is a valuable weapon of the Trustee meant to free the estate to pay larger dividends to the general creditors. He argues that the vendor under a land sale contract has, in substance, a mortgage which, if treated as an executory contract, could result in a forfeiture.

   The bankruptcy court, as a court of equity, regards substance over form, demands equality of treatment among creditors, and loathes a forfeiture. The contract should be treated as a lien; the vendor is thereby placed on a par with other lienors; forfeiture and the loss of equity are prevented. This result is analogous to the treatment of security interests disguised as leases. The lessor is entitled to assumption and performance of the lease or rejection and return of the property, with any equity lost to the estate. The security interest disguised as a lease, however, is treated as a lien, with any equity available to the estate.

   19 B.R. at 58–59.

2. *Furthering the Rehabilitation of the Debtor.* If the contract is assumed, defaults must be cured, damages must be paid, and adequate assurance of performance must be given. If the contract is a mortgage, then it may be "dealt with" in the plan in a number of ways. Treating the con-

tract as a mortgage thus allows more latitude in proposing a plan and thereby furthers the rehabilitation of the Debtor. *Id.* at 60.

3. *Adequate Protection of Creditors.* The vendor under a land sale contract can receive adequate protection while the payments are suspended. The vendor is not preferred as an administrative claimant or otherwise, but is treated on a par with other mortgagees, who are protected against any decrease in the value of their liens. *Id.* at 61.

The *Booth* rationale has been followed by a number of courts, including Judge Randolph F. Wheless, Jr. of the Southern District of Texas. See *In re Flores,* 32 B.R. 455 (Bankr.S.D.Tex.1983).

As the United States Supreme Court noted in *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984): "The Bankruptcy Code furnishes no express definition of executory contract." *Id.* at 522, n. 6, 104 S.Ct. at 1194, n. 6. However, the Supreme Court agreed that "the legislative history to [Bankruptcy Code] § 365(a) indicates that Congress intended the term to mean a contract 'on which performance is due to some extent on both sides.' H.R.Rep. No. 95–595, p. 347 (1977); see S.Rep. No. 95–989, p. 58 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787." *Id.* This definition of an executory contract is used and quoted by virtually all Bankruptcy Courts.

Congress' definition of what constitutes an "executory contract" is derived from a Minnesota Law Review article by Professor Vern Countryman, *Executory Contract in Bankruptcy: Part I,* 57 Minn.L.Rev. 439 (1973). Professor Countryman defines an executory contract as one "under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *Id.* at 460. Although Professor Countryman's article is important to any decision by this Court because of its definition of what constitutes an "executory con-

tract," it is vital to the Court's decision in this particular case because it expressly states that land sale contracts qualify as "executory contracts" under that definition:

Certainly a contract under which the vendee still owes a material part of the purchase price and the vendor has not transferred title, and is not obligated to do so until that price is fully paid, is an executory contract.... The fact that the vendor as a part of the bargain has executed and placed with the escrow agent the formal documents necessary to effect a transfer of title likewise should not alter the result where the vendee is not entitled to have the transfer effected until payments are completed.

*Id.* at 469–70. Hence, under the Countryman definition of executory contract, a land sale contract is clearly an executory contract.

In *Booth,* Judge Mabey quoted the classic definition from Professor Countryman's article, but concluded that it just did not apply to land sale contracts where the vendee is the Debtor in a bankruptcy proceeding. *Booth, supra* at 61 *et seq.*

The decision in *Booth* was criticized in *Shaw v. Dawson (In re Shaw),* 48 B.R. 857 (Bkrtcy.D.N.M.1985) on the following grounds:

1. The New Mexico Court felt that Congress clearly intended the Countryman definition of executory contract to be used since that definition was referred to in the legislative history and that a land sale contract fell within the scope of that definition.

2. Congress expressly recognized that land sale contracts are executory in 11 U.S.C. § 365(i)(1) which spells out rights for a vendee in the event the Trustee-in-Bankruptcy for the vendor attempts to reject the contract. While Congress could have provided separate provisions where the vendee is in bankruptcy, it did not do so.

*Id.* at 860.

The Court cited with approval the following excerpt from Professor Countryman's article:

[I]f the vendee becomes a bankrupt and his trustee finds it is not feasible to assume the contract and perforce rejects it, he will have no better rights than the vendee after default and may find that state law forfeits the payments already made. But this is only because the bankruptcy law now confines ... the vendee's trustee on the vendee's bankruptcy to the vendee's rights under state law. It need not do so. It could be written to invalidate state-tolerated forfeiture provisions in private contracts.

*Id.* at 861; 57 Minn.L.Rev., *supra* at 473. *See also, In re Speck,* 50 B.R. 307 (Bankr. S.D.1985) (holding land sale contracts in the agricultural setting to be executory contracts.)

The *Shaw* Court pointed out that several courts which followed *Booth* noted that a land sale contract is construed as a security device or the functional equivalent of a mortgage under the laws of the state involved. *Id.* at 861. The Court stated "That is not the law in New Mexico." *Id.*

This Court concludes that, although Congress had the power to do so, it did not define an executory contract in the present context and the Court must look to Texas law to determine whether the contract in question is an executory contract.

*Texas Law*

In Texas it is well settled that land sale contracts are executory contracts and not security devices. A distinction is drawn between land sale contracts and mortgages. This distinction is usually explained in terms of the difference between an "equitable right" and an "equitable title." The interest held by a vendee under a land sale contract is referred to as an equitable right in such property. What this equitable right means is that the vendee will be construed to have no actual interest in the real property until all of the conditions of the land sale contract have been met. So long as the vendee's obligations under the contract remain unperformed, the interest he has in the land is his right to perform under the contract. *Stinnette v.*

*Mauldin,* 251 S.W.2d 186, 203 (Tex.Civ. App.—Eastland 1952, writ ref'd n.r.e.). If the vendee at any time completes his performance under the contract, then he automatically receives "equitable title" to the property and the right to demand that the property be conveyed to him as a matter of law. *Jensen v. Bryson,* 614 S.W.2d 930 (Tex.Civ.App.—Amarillo 1981, no writ). However, until all the vendee's conditions have been performed, it is the vendor whom Texas Courts consider to have both legal and equitable title. *Johnson v. Wood,* 157 S.W.2d 146 (Tex.Comm'n App. 1941, opinion adopted).

While this may not be the rule in other states, it is the law in Texas. As explained in *Atkins v. Carson,* 467 S.W.2d 495 (Tex. Civ.App.—San Antonio 1971, writ ref'd n.r. e.):

Perhaps the majority of American jurisdictions hold that a purchaser acquires an equitable title to land immediately on entering into a valid executory contract of sale. (citations omitted) But at an early date our (Texas) Supreme Court made the distinction between an equitable title and an equitable right with regard to land contracts, holding that so long as the purchase price remained unpaid, the purchaser has only an equitable right. *Browning v. Estes,* 3 Tex. 462 (1848). The purchaser obtains equitable title only when he has fully performed under the contract. *Hemming v. Zimmerschitte,* 4 Tex. 159 (1849).

*Atkins, supra.* at 500. The *Atkins* case has been cited with approval by the prior Judge of this Court, the Honorable Bill H. Brister, in *First State Bank of Shallowater v. Onley (In re Onley),* 48 B.R. 891 (Bankr.N.D.Tex.1985).

In *Underwood v. Hogg,* 261 S.W. 556 (Tex.Civ.App.—Galveston 1924, writ ref'd), the Court construed a letter agreement between the parties. The letter agreement provided that title to the property would be delivered to the purchaser when the purchase price was paid in full. The Court concluded that the letter neither constituted an equitable title nor a deed, but was at

best only an *executory contract,* passing no title and furnishing no basis for a suit for title. *Id.* at 559. The fact that the parties in *Underwood* chose to make their agreement by use of a letter which was accepted by the purchaser does not make that transaction any different from the more formal Agreement involved in this case.

In *Jensen v. Bryson, supra,* Mrs. Bryson completed performance under a land sale contract and then tried to establish her "equitable title" to the property involved. The Court stated:

> The contract is not a bargain, sale or other conveyance which passed an interest in the realty; it merely outlined the agreed conditions for the future passing of (the owner's) interest in the realty to Mrs. Bryson.... When Mrs. Bryson fully performed under the contract ... she became vested with an equitable title to the realty superior to that of (the owner's) legal title. *Magee v. Young,* 145 Tex. 485, 198 S.W.2d 883, 886 (1947); *Johnson v. Wood,* 138 Tex. 106, 157 S.W.2d 146, 148 (1941).

614 S.W.2d at 933.

Cases such as *Shambaugh v. Moore,* 54 S.W.2d 211 (Tex.Civ.App.1932, writ ref'd) are not applicable. In *Shambaugh,* Miss Conroy sold land and a house to Mr. and Mrs. Moore who moved into the property and occupied it as their homestead. Subsequently, a paving lien was filed against the property. Under Texas law, a claim for paving is a personal claim against the owner of the property and a lien against the property unless the property is homestead. The paving company claimed legal title was in Miss Conroy, thereby giving the paving company a personal claim against her and a lien against the property. The Moores alleged that the property was homestead. The Court determined that Moores were the owners of the property and that Miss Conroy's interest in the property under her land sale contract with the Moores was not of such a nature as to render her personally liable for the paving. Further, the Court found that the Moores' homestead interest in the property exempted it from the paving lien. Although this case may be read as stating that title passed at the time of the execution of a land sale contract, in reality the case determined the liability for paving which occurred *after* the vendee had moved into the property.

In §§ 5.061 through 5.063 of the Texas Property Code, the Legislature set forth specific statutory provisions regarding the rights of a vendor under a land sale contract. The statute states that it applies to "an *executory contract* for conveyance of real property used or to be used as the purchaser's residence...." (emphasis added) TEX.PROP.CODE ANN. § 5.061 (Vernon 1984). If the Debtors herein had not filed their Bankruptcy Petition, this provision of the Texas Property Code would control Serendipity's remedies. Under this statute, Serendipity's remedy, after giving proper notice, would have been to accelerate the indebtedness of the Debtors in default, to enforce a forfeiture of any interest of the Debtors in the property, and to begin an action to evict the Debtors from the property. Serendipity would not have to go through any process of foreclosure to regain possession of the property from the Debtors.

### Conclusion

Chapter 11 of the Bankruptcy Code is designed to encourage reorganizations. For this reason, Judge Mabey's reasoning in *Booth* is very appealing and makes it difficult for this Court to reach a conclusion which may make reorganization more difficult. On the other hand, the Supreme Court, in *Butner,* mandated that the Bankruptcy Courts follow state law as to property rights, unless Congress has specified otherwise in the Bankruptcy Code. Congress has not provided any special treatment for land sale contracts where the vendee is the Debtor in a Bankruptcy proceeding. Texas courts have consistently treated land sale contracts as executory contracts. The Court, therefore, must con-

clude that the Agreement at issue in this case is an executory contract.[1]

Order accordingly.

## ORDER CONCERNING LAND SALE CONTRACT

Serendipity Farms filed a Motion to Compel the Debtors to accept or reject a land sale contract entitled Real Estate Multi-Party Exchange, Purchase and Sales Agreement dated February 28, 1982, between Serendipity Farms, the Debtors and Chris Bauer. Debtors responded that the contract was in the nature of a mortgage and should be treated as such under the Bankruptcy Code.

On April 2, 1986, a preliminary hearing was held before the Honorable Harold Abramson. Judge Abramson ordered the Debtors to pay $2,550.00 per month as adequate protection to Serendipity Farms, but specifically withheld a ruling on whether the contract involved was an executory contract or a mortgage. He referred that question to this Court.

For the reasons outlined in the Memorandum of Decision Concerning Land Sale Contract of even date herewith, this Court concludes that the contract involved in this matter is an executory contract covered by 11 U.S.C. § 365.

The Court understands that the Debtors have planted crops on the property covered by the contract. It would be a financial hardship on the Debtors and the parties who have furnished funds for the growing of said crops to require the Debtors to surrender possession of the property prior to the time the Debtors have had an opportunity to harvest the crops. The common law doctrine of emblements is recognized in Texas. For this reason, the Court gives the Debtors until January 9, 1987, to accept or reject the executory contract. The Debtors will be required, however, to continue the monthly payments for adequate

protection to Serendipity Farms as previously ordered by Judge Abramson.

It is therefore ORDERED that:

1. The Debtors shall, on or before 1:00 p.m. on January 9, 1987, either accept or reject the executory contract with Serendipity Farms. Such acceptance or rejection shall be in writing, and delivered to the attorney for Serendipity Farms with a copy to the Clerk of this Court.

   a. If rejection occurs prior to January 9, 1987, the Debtors shall surrender possession of the property to Serendipity Farms immediately upon rejection.

   b. If Debtors accept the contract, they shall at the same time provide the cure and other assurances required by 11 U.S.C. § 365.

2. If Debtors neither accept nor reject the contract by 1:00 p.m. on January 9, 1987, the contract will be deemed rejected and the Debtors shall, on January 9, 1987, surrender to Serendipity Farms possession of the property described in the contract.

3. Nothing herein shall prohibit the Debtors and Serendipity Farms from making a mutually acceptable arrangement for the Debtors to continue in possession of the property subsequent to the rejection or deemed rejection of the contract.

4. The Debtors shall continue to make the monthly payments ordered by Judge Abramson (and characterized by him as adequate protection payments) until the executory contract is accepted, rejected or deemed rejected.

   a. If the Debtors accept the executory contract, the Debtors shall be given credit on the Debtors' obligation to Serendipity Farms for all of the payments made pursuant to Judge Abramson's Order and this Order.

---

1. It is discomforting to reach a conclusion different from that reached by my friend and colleague, Judge Wheless in the *Flores* case. Since his opinion does not mention the Texas cases on land sale contracts, it must be assumed that the briefs presented to him did not raise that issue.

b. If the Debtors fail to make any one of such payments promptly when due as specified in Judge Abramson's Order, such failure shall constitute a rejection of the executory contract and the Debtors shall immediately surrender possession of the property to Serendipity Farms.